UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA,     :
          :
          : CRIMINAL NO. 1:16-CR-00215
     v.          :
          :
CHRISTIAN HOGAN,      :
     Defendant      :


*M E M O R A N D U M*

## I.    *Introduction*

Currently before the court is Defendant Christian Hogan's ("Defendant")

motion (Doc. 40) to suppress physical evidence seized by police during the searches of

two separate residences, as well as statements allegedly made by Defendant during each

of the searches.

## II.    *Background*

### A.  Events Leading to Defendant's Indictment

On or about September 22, 2015, Officer Adam Bruckhart of the West

Manchester Township Police Department submitted an application for a search warrant

with respect to premises described as "327 E. Philadelphia Street, 1st floor apartment,

York, PA," including "any cartilage [sic] associated with the residence as well as all

persons present during the service of the warrant." (See Doc. 41-1 at 1, 3). The

application sought permission to search for and seize "[h]eroin, a schedule I controlled

substance, along with any other drugs, paraphernalia, packaging materials, scales, illegal

weapons, business records, cash, identification, documents, and other physical items

relating to the possession, distribution, and sale of dangerous drugs." (Id.) Officer

Bruckhart's affidavit of probable cause in support of the application provided, in relevant part, as follows:

> Within the past 72 hours, I met with a confidential informant (CI) who stated that . . . a drug vending operation is taking place at 327 E. Philadelphia St., 1st floor apartment, York, PA. Specifically, the CI stated that a large build black male, approx. 35 YOA, later identified as [Defendant], is using his residence, 327 E. Philadelphia St., 1st floor apartment, to package bulk heroin for resale. The CI stated that [Defendant] is then selling the bundled heroin from the residence. The CI stated that they had purchased the heroin from [Defendant] for more than three months, including several times within the past month.
>
> Through an independent investigation, I obtained a photo of [Defendant]. I showed this photo to the CI. The CI confirmed the identity of [Defendant] via this photograph. A PA DL check indicates that [Defendant] lists his address as 327 E. Philadelphia St., York, PA. A public records check also indicates that [Defendant] lists his address as 327 E. Philadelphia St., York, PA. I responded to the area of 327 E. Philadelphia St., York, PA and observed the name "Hogan" on the 1st floor apartment mail box. A criminal history check indicates that [Defendant] was charged with felony drug offenses on 06/03/08 and plead guilty.
>
> Within the past 72 [hours], I directed the CI to purchase a sum of heroin from [Defendant]. Prior to the transaction, I searched the CI for any type of contraband with negative results, provided the CI with official funds, and escorted the CI to the area of 327 E. Philadelphia St., York, PA. A short time later, police observed [Defendant] exit 327 E. Philadelphia St., 1st floor apartment, and responded directly to an arranged location. At this location, [p]olice observed [Defendant] briefly meet with the CI and conduct a hand-to-hand transaction with the CI. After the transaction, the CI then responded to a predetermined location where the CI turned over a sum of heroin which they stated had been purchased from [Defendant]. The CI was searched again for any type of contraband with negative results. During the entire incident, police kept the CI under constant surveillance. The heroin was field-tested with a positive result.
>
> Also after the transaction, police kept constant surveillance on [Defendant], who was observed entering 327 E. Philadelphia St., 1st floor apartment, York, PA several minutes after the transaction.

(Id. at 2-3).

On September 23, 2015, after a Magisterial District Judge granted Officer Bruckhart's application for a search warrant, a group of eight police officers, including Officer Bruckhart, traveled to the aforementioned apartment at 327 East Philadelphia Street to execute the warrant. (Doc. 45 at 13). When the officers arrived, Defendant refused to open the door, and officers gained access to the apartment by breaching the front door. (Id.) As officers entered the apartment, Defendant allegedly attempted to reach for a handgun in the front bedroom, but he was taken into custody before he could obtain the gun. (Id.) After he was taken into custody, Officer Bruckhart conducted an interview with Defendant.[1] (Id.) In that interview, Defendant stated that police would find a handgun, heroin, and cash within the apartment, and he admitted that those items belonged to him. (Id.) Defendant also admitted to selling heroin, and he admitted that he had acquired a "street" gun because someone had robbed him earlier in the week. (Id.) Defendant conceded that he was not permitted to possess the gun because of prior felony convictions. (Id.) Police searched various rooms within the apartment and seized contraband, including a loaded revolver, raw heroin, drug paraphernalia, and $2,424.00 in cash. (Id. at 13-14).

Subsequently, on or about February 24, 2016, Officer Clayton Glatfelter of the York City Police Department submitted an application for a search warrant with respect to premises described as "766 W. Market St., 2nd flr., apartment 4 and any curtilage associated with the listed address in the City of York." (Doc. 41-2 at 3). The application sought permission to search for and seize "[h]eroin, a schedule II controlled substance, along with any other drugs or paraphernalia, packaging materials, scales,

---

[1] In his incident report, Officer Bruckhart stated that he read Defendant his Miranda warnings prior to interviewing him. (Doc. 45 at 13). Defendant, however, claims that he was never read his Miranda rights, nor did he waive them. (Doc. 40 at ¶ 30).

business records, official funds, firearms, ammunition, identification and other documentary and physical items relating to the possession, distribution and sale of narcotic and dangerous drugs." (Id. at 1, 4). In his affidavit of probable cause in support of the application, Officer Glatfelter wrote, in relevant part, as follows:

In February 2016 I received information from two Confidential Sources (CS) that a black, heavyset, male drug dealer currently resides at 766 W. Market St., 2nd flr., apartment 4 in the City of York. Where he is currently conducting a drug vending operation at his residence by storing large quantities of heroin at his residence as well as selling heroin from his residence.

Through the information provided by a Reliable Confidential Source (RCS), the drug dealer was identified through departmental records and state databases as [Defendant]. A picture obtained from state databases was shown to the RCS who positively identified [Defendant] as the individual who is currently residing at 766 W. Market St., 2nd flr., apartment 4 in the City of York where he is conducting a drug vending operation from his residence by storing and selling Heroin at his residence. In February, 2016 [Defendant] had police contact at which time [Defendant] was identified by PO Craven, PO Lentz and PO Martin and he provided them with the address of 766 W. Market St. York, PA as his current residence.

A criminal history obtained for [Defendant] revealed that in Pennsylvania in June, 2008 he plead [sic] guilty to Felony charges of Possession with Intent to Deliver A Controlled Substance. In September, 2015 [Defendant] was arrested for Felony charges of Persons not to Possess a Firearm and Possession with Intent to Deliver a Controlled Substance for which no disposition is currently reported. In New York [Defendant] was convicted of or plead [sic] guilty to six Felony and Misdemeanor offenses for Drug offenses, Robbery and Attempted Possession of Forged Instrument.

Within the last 72 hours this officer met with the RCS in order to purchase Heroin from [Defendant]. The RCS was searched for contraband with negative results. The RCS was taken to the area of 766 W. Market St. York, PA and was supplied with official recorded funds (photocopied). The RCS was observed entering 766 W. Market St., York, PA and then exiting a few minutes later. The RCS returned directly to Det. Nadzon at which time they turned over an amount of heroin they had purchased from inside 766 W. Market St., Apt. 4, York, PA[.] The RCS was searched again for contraband with

negative results. The RCS observed [Defendant] in possession of Heroin packaged for sale. The RCS also told police that [Defendant] had additional amounts of Heroin for sale. The RCS was kept under constant police surveillance during this incident. This officer later field tested the heroin purchased by the RCS, which field tested as such.

Over the past month officers utilized an RCS to purchase Heroin from [Defendant] on two separate occasions. Both times [Defendant] was identified by officers as the person who sold the heroin. On both occasions the Heroin obtained from [Defendant] field tested positive as such by this officer. Charges in these incidents are pending.

RCS is an admitted past drug user/seller and is familiar with how drugs are packaged and sold in York County. RCS should be considered reliable and has provided information in the recent past that has proven to be true and correct. That information lead [sic] to a Felony arrest where cocaine, marijuana and cash were seized.

(Id. at 2-3).

On February 26, 2016, after a Magisterial District Judge granted Officer Glatfelter's application for a search warrant, nine officers, including Officer Glatfelter, traveled to the aforementioned apartment at 766 West Market Street to execute the warrant. (Doc. 45 at 26). Upon entry into the apartment, the officers encountered Defendant in the living room. (Id.) According to an incident report, Detective Scott Nadzom read Defendant his Miranda rights[2] and informed Defendant that the officers had a warrant to search the apartment. (Id. at 28). Officer Glatfelter reported that he read the warrant to Defendant, and that Defendant stated that he understood his Miranda warnings as read by Detective Nadzom. (Id. at 26). Officer Corey Ames, Detective Nadzom, and Detective Seelig then began to search the apartment, while Officer Glatfelter interviewed Defendant. (Id.) During the interview, Defendant claimed that he did not personally use heroin or cocaine, but he admitted that he had 6-7 grams of heroin located in a shoe box

---

[2] Although multiple officers in the incident report recalled that Defendant was read his Miranda rights, (see Doc. 45 at 26, 28), Defendant, to the contrary, claims that he was never read his Miranda rights, nor did he waive them. (Doc. 40 at ¶ 49).

in the apartment's living room.  (Id.)  Defendant also stated that he had approximately

$400.00 on a dresser.  (Id.)  Defendant indicated that he lived at the apartment, which

belonged to his mother, and that his mother and sister also lived in the apartment.  (Id.)

Defendant asserted that neither his mother nor his sister had any contraband in their

rooms, and that anything illegal in the apartment belonged to him.  (Id.)  The search of the

apartment turned up contraband, including heroin, various drug paraphernalia, $2,440.00

in cash, and a semi-automatic handgun.  (Id. at 26-27).  When Detective Nadzom

inquired, Defendant admitted that the gun belonged to him, and he conceded that he

could not legally possess the gun on account of his status as a convicted felon.  (Id. at

28).

On August 3, 2016, Defendant was charged in a nine-count indictment (Doc.

1) with the following offenses: three counts of distribution of heroin, in violation of 21

U.S.C. § 841(a)(1) (Counts 1, 5, and 6); two counts of possession with intent to distribute

heroin, in violation of 21 U.S.C. § 841(a)(1) (Counts 2 and 7); two counts of felon in

possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) and 924(e) (Counts 3 and 8);

one count of possession of a firearm, in violation of 18 U.S.C. § 924(c)(1)(A) (Count 4);

and one count of possession of a firearm in furtherance of drug trafficking, in violation of

18 U.S.C. § 924(c)(1)(A) (Count 9).  Counts 2, 3, and 4 arise out of the September 2015

search of the East Philadelphia Street apartment, whereas Counts 7, 8, and 9 arise out of

the February 2016 search of the West Market Street apartment.[3]  On August 9, 2016,

Defendant entered a plea of not guilty (Doc. 10) as to all of the counts against him.

B. Defendant's Motion to Suppress

---

[3] The indictment also raises forfeiture allegations against Defendant in relation to the items seized
from both apartments.  (Doc. 1 at 10-12).

6

On October 20, 2017, Defendant filed the instant motion (Doc. 40) to suppress the physical evidence and oral statements obtained by police at the searches of both aforementioned properties.

First, Defendant moves to suppress all physical evidence seized by police during the September 2015 search of the East Philadelphia Street apartment, arguing that the search of the apartment violated his rights under the Fourth and Fourteenth Amendments to the United States Constitution.  Defendant alleges that the application and affidavit of probable cause used to obtain the search warrant for the East Philadelphia Street property was facially deficient in various ways and that the affidavit "did not establish a totality of circumstances from which it could be determined probable cause existed that contraband would be found."  (See Doc. 40 at ¶¶ 18-23).

Second, Defendant moves to suppress all physical evidence seized by police during the February 2016 search of the West Market Street apartment, arguing that the search of that apartment also violated his rights under the Fourth and Fourteenth Amendments to the United States Constitution.  As he argues with respect to the East Philadelphia Street apartment, Defendant alleges that the application and affidavit of probable cause used to obtain the search warrant for the West Market Street apartment also was facially deficient in various ways and that the affidavit "did not establish a totality of circumstances from which it could be determined probable cause existed that contraband would be found."  (See id. at ¶¶ 35-42).  Moreover, Defendant avers that the affidavit of probable cause for the West Market Street apartment omitted various material facts, and he contends that such omissions amount to a "reckless disregard of the truth." (See id. at ¶¶ 38-40).

Third, Defendant moves to suppress the oral statements that he made to officers during the searches of the East Philadelphia Street and West Market Street apartments, arguing that the statements were obtained in violation of his Fifth, Sixth, and Fourteenth Amendment rights.  (Id. at ¶¶ 31, 50).  Defendant contends that the statements were obtained as "the fruit of the illegal search[es]" of the apartments and that he made the statements after being detained and interrogated without being read, and without having waived, his Miranda rights.  (Id. at ¶¶ 28-30; 47-49).

C. The Government's Response to Defendant's Motion to Suppress

On November 3, 2017, the Government filed a response in opposition (Doc. 43) to Defendant's motion to suppress.  In its response, the Government argues that Defendant's motion to suppress should be denied in its entirety.

First, the Government argues that the search warrants for each of the residences were facially valid because "the [magisterial district judge] was presented with more than sufficient evidence to establish probable cause to believe both apartments contained contraband."  (See Doc. 43 at 10).  The Government asserts that in spite of Defendant's arguments about the reliability of the informants and the staleness of his criminal history, there was other evidence presented in each of the affidavits that established probable cause.

Second, the Government contends that even if the search warrants were not facially valid, the physical evidence obtained through the search warrants is admissible under the "good-faith" exception.  (Id. at 12).

Finally, the Government argues that the oral statements made by Defendant during both of the searches should not be suppressed because the statements were not

the fruit of an illegal search, and because Defendant was properly Mirandized before being questioned on both occasions.  (Id. at 14-15).  The government asserts that according to officer statements contained within the respective incident reports, Defendant was Mirandized by Officer Bruckhart during the East Philadelphia Street search on September 24, 2015, and he was Mirandized by Detective Nadzom during the West Market Street search on February 26, 2016.  (Id. at 15).

III.       Discussion

  A.  Search Warrants and Affidavits of Probable Cause

We first address Defendant's claims that the search warrants for both apartments were issued based upon deficient affidavits of probable cause.

1.  Standard of Review – Probable Cause Determinations.

With regard to search warrants, "[a] magistrate's determination of probable cause should be paid great deference by reviewing courts."  Illinois v. Gates, 462 U.S. 213, 236 (1983) (citation and internal quotation marks omitted).  "The role of a reviewing court is not to decide probable cause de novo, but to determine whether 'the magistrate had a substantial basis for concluding that probable cause existed.'"  United States v. Stearn, 597 F.3d 540, 554 (3d Cir. 2010) (quoting Gates, 462 U.S. at 238).  "If a substantial basis exists to support the magistrate's probable cause finding, we must uphold that finding even if 'a different magistrate judge might have found the affidavit insufficient to support a warrant.'"  Id. (quoting United States v. Conley, 4 F.3d 1200, 1205 (3d Cir. 1993)).  Although a reviewing court must not merely "rubber stamp a magistrate's conclusions," United States v. Whitner, 219 F.3d 289, 296 (3d Cir. 2000), "we must heed the Supreme Court's direction that 'doubtful or marginal cases in this area should be

largely determined by the preference to be accorded to warrants.'" <u>Stearn</u>, 597 F.3d at 554 (quoting <u>Gates</u>, 462 U.S. at 237 n.10).  Probable cause determinations, as they pertain to applications for search warrants, are to be informed by a "totality-of-the-circumstances analysis." <u>Gates</u>, 462 U.S. at 238.  When presented with an application for a search warrant, "the task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." <u>Id.</u>

Generally speaking, "a magistrate may issue a warrant relying primarily or in part upon statements of a confidential informant, so long as the totality of the circumstances gives rise to probable cause." <u>Stearn</u>, 597 F.3d at 555.  "Before the Supreme Court's decision in <u>Gates</u>, many courts held under the Aguilar-Spinelli doctrine that an informant's statements could not furnish probable cause unless the affidavit established both the informant's 'veracity' and his 'basis of knowledge.'" <u>Id.</u> (citing <u>Spinelli v. United States</u>, 393 U.S. 410 (1969); <u>Aguilar v. Texas</u>, 378 U.S. 108 (1964)).  The Supreme Court in <u>Gates</u>, however, abandoned the two-pronged Aguilar-Spinelli test in favor of the totality-of-the-circumstances approach, reasoning that "the veracity of persons supplying anonymous tips is . . . largely unknown, and unknowable," and, therefore, "anonymous tips seldom could survive a rigorous application of either of the Spinelli prongs." <u>Gates</u>, 462 U.S. at 237.  <u>Gates</u> acknowledged that an informant's "veracity" and "reliability" are still relevant to a probable cause analysis but held that "these elements should [not] be understood as entirely separate and independent elements to be rigidly

applied in every case." Id. at 230.  Rather, "a deficiency in one [element] may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia or reliability."  Id.  "In particular, Gates endorsed independent '[police] corroboration of details of an informant's tip' as an important method for establishing a tip's reliability."  Stearn, 597 F.3d at 555 (quoting Gates, 462 U.S. at 241).

Given the aforementioned law and the facts of this case, we find that the magisterial district judges had a substantial basis for finding that probable cause existed for the search of each of the apartments.

### 1.  East Philadelphia Street Apartment Search

With regard to the East Philadelphia Street search, Defendant argues that the affidavit of probable cause was insufficient because it provided no facts to explain the informant's veracity or basis of knowledge that heroin was being distributed from Defendant's apartment.  Moreover, Defendant asserts that the informant's reliability is hampered by the fact that he himself is an admitted heroin purchaser who may have been acting as an informant to "curry favor with police."  (See Doc. 41 at 5-6).  Defendant additionally avers that the affidavit relied upon allegedly stale criminal history information, in that it references a conviction from June 2008.  We find these arguments unconvincing.

Contrary to Defendant's purported arguments, Officer Bruckhart's affidavit of probable cause was not founded merely on stale criminal history and conclusory allegations of an unreliable informant.  Officer Bruckhart conducted an independent investigation to verify the statements that were made by the informant.  For example, Officer Bruckhart conducted a driver's license check which confirmed that Defendant

maintained a residence at 327 East Philadelphia Street in York, and he actually traveled to the address and observed that the first floor apartment's mailbox bore Defendant's last name. Then, Officer Bruckhart took his independent investigation a step further by planning a controlled buy from Defendant at the East Philadelphia Street address. During that operation, Defendant was observed emerging from East Philadelphia Street, 1st Floor Apartment, and he responded to an arranged location at which he conducted a hand-to-hand transaction with the informant and provided him with heroin. Moreover, while Defendant argues that the informant's history of using heroin himself hampers his credibility, one could reasonably find that his admitted previous heroin buys in fact bolstered the reliability of his accounts because they provided a "basis of knowledge" for the statements he made about Defendant's heroin operations. See United States v. Pearson, 181 F. App'x 192, 195 (3d Cir. 2006) (holding that the fact that "both informants had very recently purchased drugs from [the defendant] out of his vehicle" helped to "demonstrate that the informants had a sufficient basis of knowledge."

Considering the foregoing, it was entirely reasonable for the magisterial district judge, based on the totality of all facts presented in Officer Bruckhart's affidavit, to conclude that there was a fair probability that heroin and other drug-related contraband would be found inside East Philadelphia Street, 1st Floor Apartment.

Defendant alternatively argues that "even assuming arguendo that the Court rules that the Affidavit of Probable Cause included sufficient information to establish probable cause that drugs would be found within the [East Philadelphia Street] apartment, no inference can be drawn that illegal weapons would be also found," and, therefore, the warrant should not have included "illegal weapons" in the list of items to be searched and

seized. (Doc. 41 at 4). Defendant reasons that the affidavit "does not contain any allegations from which a reasonable person could conclude weapons of any type will be found within the residence," pointing out that "[t]here is absolutely no mention of weapons whatsoever within the Affidavit of Probable Cause." (Id.) We disagree.

Multiple courts have recognized that there is a "well-known and attested-to link between drug distribution and firearms." United States v. Perry, 560 F.3d 246, 251 (4th Cir. 2009); see also United States v. Russell, 134 F.3d 171, 183 (3d Cir. 1998) ("[I]t has long been recognized that . . . guns are tools of the drug trade."); United States v. Crespo, 834 F.2d 267, 271 (2d Cir. 1987), cert. denied, 485 U.S. 1007 (1988) ("firearms are as much tools of the [drug] trade as are commonly recognized articles of narcotics paraphernalia."). Moreover, courts have "often recognized that firearms . . . are commonly kept on the premises of major narcotics dealers." United States v. Estrada, 430 F.3d 606, 613 (2d Cir. 2005) (holding that police's knowledge that suspect kept drugs in apartment "gave rise to a reasonable belief that he also kept a gun there."); see also United States v. Duncan, 308 Fed.Appx. 601, 616 n.12 (3d Cir. 2009) (recognizing the Second Circuit's holding in Estrada); Perry, 560 F.3d at 251-52 (holding that because an informant had observed cocaine and crack at the defendant's residence, there was sufficient probable cause to search for and seize "firearms and weapons" even though the informant did not personally observe firearms in the residence).[4]

In the instant matter, even though the affidavit of probable cause made no explicit mention of weapons or firearms, it did provide sufficient facts from which one could

---

[4] The court in Perry reasoned that "[a]lthough the informant did not personally observe . . . firearms in the [defendant's] house, the informant's observation of cocaine being prepared and sold at the house, as well as the well-known and attested-to link between drug distribution and firearms, gave the officers probable cause to search for . . . firearms." 560 F.3d at 251.

infer a likely presence of heroin in the apartment.  Given the likelihood that illicit drugs would be found in the apartment and the evidence that Defendant was engaged in the business of selling heroin, we find that it was reasonable for the magisterial district judge to infer that firearms would likely be found in Defendant's apartment given the long-recognized nexus between firearms and drug distribution.  Moreover, in this matter, considering that the affidavit explained that Defendant had prior felony convictions, it was reasonable for the magisterial district justice to infer that any firearms found in the apartment would likely be considered "illegal" weapons, not only because they may have been used in furtherance of drug trafficking but also because Defendant was a felon whose mere possession of a firearm would constitute illegal activity.

Considering the foregoing, Defendant's motion to suppress will be denied as to the physical evidence seized from 327 East Philadelphia Street, 1st Floor Apartment, York, PA on September 23, 2015.

2.  West Market Street Apartment Search

With regard to the search warrant for West Market Street, some of the arguments Defendant in favor of his suppression motion raises are similar to those he raises with respect to the East Philadelphia Street search.  In particular, Defendant argues that the affidavit of probable cause for the warrant provided no information regarding informant veracity or basis of knowledge; that the affidavit of probable cause relied upon stale criminal history information; and that officers had no probable cause to search for illegal weapons even if there was probable cause to search for other contraband.  Again, we find these arguments unconvincing.

As was the case with East Philadelphia Street, the West Market Street affidavit of probable cause was not based merely on conclusory informant allegations and Defendant's criminal history.  Not only were police told by multiple informants that Defendant was selling drugs out of his residence at 766 West Market Street, 2nd Floor, Apartment 4, but they actually employed one of the informants, described by Officer Glatfelter as a "Reliable Confidential Source" ("RCS"), to conduct a controlled buy from Defendant at 766 West Market Street within 72 hours before Officer Glatfelter filed his warrant for the search warrant.  Additionally, the affidavit indicated that officers used confidential informants to purchase heroin from Defendant on two other occasions in the month leading up to the February 26, 2016 search, and on both occasions, Defendant had been identified by officers as the person who sold the heroin.  What's more, despite Defendant's claim that the affidavit fails to provide facts to establish informant veracity, the affidavit in fact states that the RCS that participated in the controlled buy had provided true and correct information to police in the recent past and that such information led to a felony arrest where cocaine, cash, and marijuana were seized.  See Pearson, 181 F. App'x at 195 (holding that the veracity of confidential informants was sufficient when "the warrant application explain[ed] that each informant had provided accurate tips in the past, with his information resulting in various arrests and convictions.").

Defendant also argues that "even if, for the sake of argument, it is assumed that the Affidavit includes sufficient information to establish heroin would likely be found within the [West Market Street] apartment, no inference can  be drawn that firearms or ammunition would also be found."  (Doc. 41 at 10).  Defendant raised a practically identical argument with regard to the East Philadelphia Street apartment, and again, we

are not convinced by that argument.  Given the likelihood that illicit drugs would be found in the [766 West Market Street] apartment and the evidence that Defendant was engaged in the business of selling heroin, we find that it was reasonable for the magisterial district judge to infer that firearms would likely be found in the apartment given the long-recognized nexus between firearms and drug distribution.  Thus, it was appropriate for the search warrant to list "firearms" and "ammunition" among the items to be searched and seized.

Additionally, Defendant contends that the controlled buy involving the RCS failed to establish probable cause for the West Market Street search because while police saw the RCS enter into premises at 766 West Market Street, they did not observe whether the RCS actually went into apartment 4 specifically, and the affidavit did not state that the police witnessed any exchange or interaction between Defendant and the RCS.  We find this argument to be legally unsound.  It has been noted that "direct evidence of a crime is not required for the issuance of a search warrant."  Id. (citing United States v. Burton, 288 F.3d 91, 103 (3d Cir. 2002)).  Indeed, "an affidavit 'need not reflect the direct personal observations of the affiant.'"  Id. (quoting Aguilar, 378 U.S. at 114).  Rather, "probable cause is present so long as the veracity and basis of knowledge of persons supplying hearsay information provide a fair probability, under the totality of the circumstances, that evidence of criminal activity will be discovered in a certain place."  Id. (internal quotation marks omitted) (citing Gates, 462 U.S. at 238).  In the instant matter, even if the officers did not observe an exchange or interaction between the RCS and Defendant, they did observe the RCS enter the premises at 766 West Market Street and emerge soon thereafter with heroin.  The RCS, who had provided useful, true, and correct information to

officers in prior cases, previously told officers that Defendant sold drugs out of Apartment 4 specifically, and earlier in February 2016, Defendant interacted with three police officers and confirmed that he was currently residing at 766 West Market Street. Based on these facts and the RCS's veracity, it would be reasonable for one to conclude that there was a fair probability drugs would likely be found inside of Apartment 4.

Defendant also argues that "even if, for the sake of argument, it is assumed that the Affidavit includes sufficient information to establish heroin would likely be found within the [West Market Street] apartment, no inference can be drawn that firearms or ammunition would also be found." (Doc. 41 at 10). Defendant raised a practically identical argument with regard to the East Philadelphia Street apartment, and again, we are not convinced by that argument. Given the likelihood that illicit drugs would be found in the [766 West Market Street] apartment and the evidence that Defendant was engaged in the business of selling heroin, we find that it was reasonable for the magisterial district judge to infer that firearms would likely be found in the apartment given the long-recognized nexus between firearms and drug distribution. Thus, it was appropriate for the search warrant to list "firearms" and "ammunition" among the items to be searched and seized.

Finally, Defendant argues that the affidavit of probable cause for the West Market Street apartment contained false and misleading information in reckless disregard for the truth. Specifically, Defendant avers that the affidavit omitted the fact that his alleged September 2015 prior offenses referenced therein occurred at 327 East Philadelphia Street rather than at West Market Street, and, Defendant further avers that the affidavit omitted the fact that Defendant's current address listed with PennDOT was

17

327 East Philadelphia Street, rather than 766 West Market Street.  Upon a review of relevant law, we are unable to conclude that the alleged omissions from the affidavit justify application of the exclusionary rule.

The leading case on allegedly misleading search warrant affidavits is Franks v. Delaware, 438 U.S. 154 (1978).  In Franks, the Supreme Court held that a misleading search warrant may justify suppression of evidence under the Fourth Amendment if a Defendant satisfies two elements: (1) "that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit"; and (2) "the allegedly false statement is necessary to the finding of probable cause."  Id. at 155-56; see also United States v. Frost, 999 F.2d 737, 743 (3d Cir. 1993) ("[I]n order to secure suppression of the fruits of the search, a defendant must show *both* that bad faith or reckless disregard existed on the part of the affiant, *and* that there would have been no probable cause but for the incorrect statement) (emphasis in original).  Although Franks dealt only with misstatements, courts have also "applied the Franks test to situations where affiants have *omitted* information from the affidavit."  Frost, 999 F.2d at 743 n.2 (emphasis added) (citations omitted).

In the instant matter, Defendant fails to satisfy either prong of the Franks test.  First, Defendant fails to provide a scintilla of evidence to suggest that Officer Glatfelter made the alleged omissions knowingly and intentionally or that the omissions he alleges were anything but innocent.  Furthermore, even if the Officer's omission was intentional, Defendant cannot establish that the omitted facts were necessary to a finding of probable cause.  Based on the facts discussed above, there was sufficient evidence presented from which one could infer the likely existence of contraband at 766 Market

Street, 2nd Floor, Apartment 4, and the mere fact that the affidavit did not mention Hogan's 327 East Philadelphia Street address would not have made a finding of probable cause less likely. Although he resided at East Philadelphia Street when his September 2015 charges arose and his official PennDOT records still listed East Philadelphia Street as his address, Defendant himself confirmed to various officers early in February 2016 that he was currently residing at 766 West Market Street. Therefore, even if the East Philadelphia Street address would have been referenced in the affidavit, the magisterial district judge, when faced with the February 2016 search warrant application, could have concluded that Defendant currently lived at 766 West Market Street and that his former East Philadelphia Street address was irrelevant to a probable cause determination.

Considering the foregoing, Defendant's motion to suppress will be denied as to the physical evidence seized from 766 West Market Street, 2nd Floor, Apartment 4, York, PA on February 26, 2016.

B. The "Good Faith" Rule

It is a longstanding principle that even "[w]hen police act under a warrant that is [facially] invalid for lack of probable cause, the exclusionary rule does not apply if the police acted 'in objectively reasonable reliance' on the subsequently invalidated search warrant." Herring v. United States, 555 U.S. 135, 142 (2009) (citing United States v. Leon, 448 U.S. 897, 922 (1984)). This principle has been deemed the "good faith" rule. See id. "Ordinarily, 'the mere existence of a warrant . . . suffices to prove that an officer conducted a search in good faith,' and will obviate the need for 'any deep inquiry into reasonableness.'" Stearn, 597 F.3d at 561 (quoting United States v. Hodge, 246 F.3d 301, 308 (3d Cir. 2001)). The courts, however, have identified "narrow situations" in which

"the good faith doctrine is not sufficient to override the warrant's lack of probable cause."[5]
Id.

Defendant contends that the good faith exception to the exclusionary rule does not apply to either of the searches because the affidavits of probable cause contained "false and misleading information in reckless disregard of the truth" and because the affidavit was "so lacking in probable cause as to render official belief in its existence entirely unreasonable." However, because we have already determined that the warrants for both properties were supported by probable cause and because the information that established probable cause was not false and misleading, we find that it is not necessary to address whether the good faith exception applies to the searches in the instant matter. See, e.g., Whitner, 219 F.3d at 299 n.6 ("We do not reach the question of whether the good faith exception established in [Leon] applies because we find that the magistrate judge had a substantial basis from which to conclude that probable cause existed.").

C. Defendant's Oral Statements

Having concluded that the seizures of physical evidence from both of the apartments were lawful, we now address Defendant's claims regarding the oral statements that he allegedly made during the execution of each search warrant. Defendant claims that his oral statements should be suppressed for two reasons. First,

---

[5] The courts have identified the following "four narrow situations" in which the good faith doctrine is not sufficient to override a warrant's lack of probable cause: (1) when the magistrate issued the warrant in reliance on a deliberately or recklessly false affidavit; (2) when the magistrate abandoned his judicial role and failed to perform his neutral and detached function; (3) the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) the warrant was so facially deficient that it failed to particularize the place to be searched or things to be seized. Stearn, 597 F.3d at 561 n.19 (citing United States v. Williams, 3 F.3d 69, 74 n. 4 (3d Cir. 1993)).

Defendant argues that his statements were obtained as "the fruit of the illegal search[es]" of the apartments. (Doc. 40 at ¶¶ 29, 48). Second, he alleges that he made the statements after being detained and interrogated without being read, and without having waived, his <u>Miranda</u> rights. (<u>Id.</u> at ¶¶ 28, 30, 47, 49). Because we have already concluded that the searches were lawful, we find that the statements were not obtained as the fruit of illegal searches, and we need not analyze this claim in depth. Consequently, we turn to Defendant's <u>Miranda</u> claim.

The parties dispute whether Defendant was read his <u>Miranda</u> rights prior to being interviewed during each search. Defendant categorically asserts that he was not read his <u>Miranda</u> rights prior to being interrogated, nor did he waive them. Defendant's assertion, however, is directly contradicted by the officer-prepared incident reports pertaining to each search, in which Officers indicated that they read Defendant his <u>Miranda</u> rights and that he understood them. Given these facts, we find that the <u>Miranda</u> issue raised involves a matter of credibility for which an evidentiary hearing is required. A hearing on Defendant's <u>Miranda</u> claims shall be scheduled for the time and date set forth in the order accompanying this memorandum.

IV.     *Conclusion*

In conclusion, because the respective search warrants for 327 East Philadelphia Street, 1st Floor Apartment, York, PA, and 766 West Market Street, 2nd Floor, Apartment 4, York, PA, were facially valid, Defendant's motion to suppress will be denied as to all physical evidence seized from both of the apartments. As for the oral statements, we find that an evidentiary hearing is necessary for the resolution of Defendant's <u>Miranda</u> claims. An appropriate order follows.

/s/ William W. Caldwell
William W. Caldwell
United States District Judge